**CUMBERLAND COAL RESOURCES, LP, Petitioner**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Respondents.**

No. 04–1427.

United States Court of Appeals, District of Columbia Circuit.

Nov. 10, 2005.

Karen Lynn Johnston, Jackson Kelly PLLC, Denver, CO, Ralph Henry Moore, Jackson Kelly PLLC, Pittsburgh, PA, for Petitioner.

W. Christian Schumann, Counsel, Robin Ann Rosenbluth, Attorney, Mine Safety & Health Administration (MSHA), Arlington, VA, John Thomas Sullivan, Thomas A. Stock, Mine Safety and Health Review Commission, Washington, DC, for Respondents.

Before: ROGERS, Circuit Judge, and WILLIAMS and EDWARDS,* Senior Circuit Judges.

---

* Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

## JUDGMENT

This cause was considered on a petition for review of an order of the Federal Mine Safety and Health Review Commission and was briefed and argued by counsel. For the reasons stated in the accompanying memorandum, it is

**ORDERED and ADJUDGED** that the petition for review be denied.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

## MEMORANDUM

This is a petition for review of an order of the Federal Mine Safety and Health Review Commission finding that RAG Cumberland Resources LP ("Cumberland") violated an under-ground coal mine ventilation regulation. *Sec'y of Labor v. RAG Cumberland Res. LP ("Order")*, 26 F.M.S.H.R.C. 639 (2004). The regulation, promulgated by the Secretary of Labor pursuant to section 201 of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. § 811 (2000), requires special air courses called bleeders "to control the air passing through the area and to continuously dilute and move methane-air mixtures ... from the worked-out area away from active workings...." 30 C.F.R. § 75.334(b)(1). Removing methane is essential because it is explosive when concentrated between five and fifteen percent in the air. The Commission upheld the Secretary's interpretation of the regulation as requiring that the bleeder system function "in an effective manner" despite the fact that the regulation "does not literally set forth [such] a requirement" on the ground that such a requirement is implicit in the language and purpose of the regulations. *Order*, 26 F.M.S.H.R.C. at 647.

Although Cumberland stated at oral argument that it was not suggesting the regulation permits a bleeder system to operate so poorly that it creates the risk of catastrophic explosion, it is difficult to understand Cumberland's challenge to the Secretary's interpretation in any other manner. Its brief states that the regulation contains only two requirements: first, that the methane-air mixture be continuously diluted; and second, that the mixture be moved away from active workings for transport out of the mine. *See* Petitioner's Brief at 23. Because its bleeder system performed these functions to some extent, Cumberland contends it was in compliance with section 75.334(b)(1) on July 5 and 6, 2000, *see id.*, the days for which Cumberland was cited. Cumberland maintains that other provisions of the regulatory scheme are intended to address effectiveness. In light of our deferential standard of review when the Commission and the Secretary are in agreement, *RAG Cumberland Res. LP v. Fed. Mine Safety & Health Review Comm'n*, 272 F.3d 590, 596 (D.C.Cir.2001); *see also Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 5–6 (D.C.Cir.2003), there is no basis on which the court could conclude that the Secretary's interpretation is inconsistent with the language and purpose of the standard.

The Secretary and the Commission focus on the regulation's use of the word "control", the regulation's purpose of protecting miner safety, and the Mine Act and its legislative history. *Order*, 26 F.M.S.H.R.C. at 646–47. Under Cumberland's reading, to "control" means only to direct the flow of air. The plain language of the regulation makes clear that the air at issue contains methane; the bleeder system must control, dilute, and move

that air to the surface. Under Cumberland's interpretation, the word "control" effectively becomes surplusage, while the Secretary's interpretation gives meaning to the regulation by requiring that the bleeder system "control" methane levels so as to avoid an explosion hazard. Cumberland's focus on other regulatory provisions is to no avail. For example, the Secretary points out with regard to 30 C.F.R. § 75.334(c), calling for a mine ventilation plan, that there would be no point to requiring plans to specify a means to determine effectiveness if there were no requirement that the bleeder system be effective. Similarly, the Secretary observes that nothing in section 75.323(e), setting a two percent limit for methane concentration in a bleeder split of air immediately before the air joins another split of air, indicates that a bleeder system's effectiveness is to be determined solely by whether it is in compliance with the two percent limit.

Cumberland's objection that the Secretary's interpretation creates uncertainty about the ceiling for acceptable methane levels is more problematic. Assuming Cumberland has properly preserved a lack of notice defense, *but see Order*, 26 F.M.S.H.R.C. at 647 n. 14; 30 U.S.C. § 816(a); *Excel Mining*, 334 F.3d at 12 n. 11, Cumberland does not suggest that it was unaware of the concerns created by the rising levels of methane accumulation on July 5 and 6, 2000. It hardly could. The evidence before the Commission showed that its own managers acknowledged the concerns and realized that the bleeder system was not working properly. The testimony of Cumberland's safety manager established that the bleeder system readings of methane accumulation were. "atypical" and "bad," and its senior mining engineer admitted that operating the mine with methane concentrated at 3.6 percent was hazardous. The weekly examination records of the Number 1 bleeder shaft and Bleeder Evaluation Point 5A reflected a rise in methane concentrations in the weeks before July 5, 2000. By any measure of effectiveness, Cumberland's bleeder system failed.

It follows that there was substantial evidence to support the Commission's finding that Cumberland's bleeder system was in violation of the regulation. In addition to the admissions of Cumberland's employees, the rising methane concentrations on July 5 and 6, *see* Addendum, demonstrate the failure of Cumberland's bleeder system to perform "in an effective manner."

Accordingly, we deny the petition for review.

## ADDENDUM

### *Methane Readings [1] at the Cumberland Mine, June 14 through July 6, 2000*

| Time of Reading | No. 1 Bleeder Shaft | BEP 5A |
| --- | --- | --- |
| June 14 | 1.8 | 3.5 |
| June 30 | 1.9 | 3.5 |
| July 3 | 1.9; 3.34 [2] | 3.8 |
| July 5, 12:00 PM | 1.8 to 2.2 | ? |
| July 5, 3:30 PM | 3.6 | ? |

1. Unless otherwise indicated, these readings were conducted with a handheld methane detector. The figures indicate the percentage of methane in the air at each location.

2. Average of four bottle sample tests. Bottle sample readings are more accurate than handheld detector readings.

| July 5, 7:30 PM | 3.6 | ? |
|---|---|---|
| July 5, 10:30 PM | 3.6 | ? |
| July 6, 1:30 AM | 3.8 | ? |
| July 6, 2:30 AM | 4.2 | ? |
| July 6, 6:00 AM | 2.8 | ? |
| July 6, 2:00 PM | 2.1 | ? |