FILED
United States Court of Appeals
Tenth Circuit

July 18, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

PEABODY TWENTYMILE MINING,
LLC,

     Petitioner,

v.

SECRETARY OF LABOR, and
FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,

     Respondents.

No. 17-9540

---

**Petition for Review from an Order of the
Federal Mine Safety and Health Review Commission
(MSHR Nos. WEST 2015-64, WEST 2014-930-R)**

---

Ralph Henry Moore, II (Patrick W. Dennison with him on the briefs), Jackson Kelly
PLLC, Pittsburgh, Pennsylvania, for Petitioner.

Emily Toler Scott, Attorney (Nicholas C. Geale, Acting Solicitor of Labor; April E.
Nelson, Associate Solicitor; and Ali A. Beydoun, Counsel, Appellate Litigation, with her
on the brief), United States Department of Labor, Office of the Solicitor, Arlington,
Virginia, for Respondents.

---

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.

---

**EID**, Circuit Judge.

Peabody Twentymile Mining, LLC ("Peabody Twentymile") operates the Foidel Creek Mine, a large underground coal mine in Colorado. The mine uses over one thousand ventilation stoppings to separate the fresh intake air from the air flowing out of the mine that has been circulated through areas where extraction is occurring. Federal law requires permanent ventilation stoppings to be "constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately." 30 C.F.R. § 75.333(e)(1)(i). In 2014, an inspector for the Mine Safety and Health Administration ("MSHA") issued a citation to Peabody Twentymile for a violation of this safety standard because it had used polyurethane spray foam to seal the perimeter of a permanent concrete block ventilation stopping.

Peabody Twentymile unsuccessfully contested the citation and civil penalty before an administrative law judge ("ALJ"). The ALJ relied on the preamble to the ventilation stopping regulation, which listed six "traditionally accepted construction methods," to determine that Peabody Twentymile's method of constructing concrete block stoppings was not "traditionally accepted" and was subject to a $162 fine. Peabody Twentymile then petitioned the Federal Mine Safety and Health Review Commission (the "Commission") for review, and the Commission issued an evenly split decision, causing the ALJ's decision to stand. Peabody Twentymile now petitions for judicial review of the ALJ's decision. Exercising jurisdiction under 30 U.S.C. § 816(a)(1), we grant Peabody Twentymile's petition for review. Because we conclude that Peabody Twentymile's construction method was "traditionally accepted" by MSHA under the

2

unambiguous meaning of that phrase, we reverse the ALJ's decision and vacate the citation.

## I.

"Section 101(a) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 811(a), directs the Secretary of Labor to establish mandatory health and safety standards for mines. Under this authority the Secretary has promulgated a set of regulations governing underground-coal-mine ventilation." *Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1180 (10th Cir. 2008) (citing 30 C.F.R. §§ 75.300–75.389). These regulations set forth generally applicable standards for mine ventilation systems and require each mine operator to develop and follow a mine-specific ventilation control plan, which must be approved by an MSHA district manager. *See id.* (citing 30 C.F.R. § 75.370(a)).

Here, the relevant regulation, 30 C.F.R. § 75.333(e)(1)(i), concerns the construction of mine ventilation stoppings. Ventilation stoppings protect miners from noxious air and help maintain the integrity of the mine's escapeways by separating clean intake air from polluted outgoing air. The regulation mandates:

> Except as provided in paragraphs (e)(2), (3) and (4) of this section all . . . permanent stoppings . . . installed after June 10, 1996, shall be constructed in a *traditionally accepted method* and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls.

30 C.F.R. § 75.333(e)(1)(i) (emphasis added). MSHA promulgated this version of the rule in 1996 and published a preamble to the standard. Safety Standards for Underground

3

Coal Mine Ventilation, 61 Fed. Reg. 9764, 9783–84 (Mar. 11, 1996). The standard itself does not define the methods or materials that have been "traditionally accepted," but the preamble notes that, "[s]ince the inception of the Mine Act, a number of traditionally accepted construction methods have performed adequately and have served their intended function of separating air courses." Joint Appendix ("JA") at 211 (61 Fed. Reg. 9783). The preamble goes on to list "traditionally accepted construction methods," including:

> [1] 8-inch and 6-inch concrete blocks (both hollow-core and solid) with mortared joints;
>
> [2] 8-inch and 6-inch concrete blocks dry-stacked and coated on both sides with a strength enhancing sealant suitable for dry-stacked stoppings;
>
> [3] 8-inch and 6-inch concrete blocks dry-stacked and coated on the high pressure side with a strength enhancing sealant suitable for dry-stacked stoppings;
>
> [4] steel stoppings (minimum 20-gauge) with seams sealed using manufacturer's recommended tape and with the tape and perimeter of the metal stopping coated with suitable mine sealant; and
>
> [5] lightweight incombustible cementatious masonry blocks coated on the joints and perimeter with a strength enhancing sealant suitable for dry-stacked stoppings.

*Id.* (61 Fed. Reg. 9783).

Peabody Twentymile's Foidel Creek Mine utilizes two types of ventilation stoppings: (1) temporary metal panel stoppings; and (2) permanent concrete block stoppings. The concrete block stoppings are constructed at Peabody Twentymile by stacking concrete blocks, covering the blocks on their face with a strength-enhancing bonding agent, and sealing the sides and tops of the stoppings with polyurethane foam.

4

Peabody Twentymile has been utilizing this method to construct block stoppings since at least 1991. Further, Peabody Twentymile has included its use of polyurethane foam to seal the perimeters of ventilation stoppings in its ventilation plans since 1991. These ventilation plans have been reviewed and approved by the Secretary of Labor (the "Secretary") at least once every six months. *See* 30 U.S.C. § 863(o); 30 C.F.R. § 75.370(g).

During an August 5, 2014, inspection of the Foidel Creek Mine, an MSHA inspector and MSHA assistant district manager noticed that the perimeter of one concrete block stopping was sealed with Touch 'n Seal polyurethane foam and lacked any strength-enhancing sealant around the perimeter behind the foam. After the inspection, the MSHA inspector issued a citation alleging a violation of 30 C.F.R. § 75.333(e)(1)(i) with regard to the concrete block stopping. The citation read, in part:[1]

> The stopping was not built in a traditionally accepted method that has demonstrated to perform adequately. The following conditions were observed;
> 1.) The perimeter of the stopping was not sealed with mortar.
> 2.) The perimeter of the stopping was sealed [wi]th touch N seal foam measuring approximately 0 to 6 inches along the ribs and roof.

JA at 198. There is no dispute the MSHA had never issued a citation to Peabody Twentymile for its use of polyurethane foam prior to the 2014 citation.

Peabody Twentymile contested the citation before a Commission ALJ. After a hearing on the merits, the ALJ issued a decision upholding the citation for violating 30

---

[1] The citation was modified after originally issued. The modified language is included here.

C.F.R. § 75.333(e)(1)(i) as well as the $162 penalty imposed against Peabody Twentymile for the violation. The ALJ found the traditionally accepted construction methods listed in the regulation's preamble to be exhaustive and not inclusive of the construction method Peabody Twentymile used for its concrete block stoppings.

Peabody Twentymile petitioned the Commission for discretionary review of the ALJ's decision, and the Commission granted review. Two Commission members voted to affirm the ALJ's decision, and two Commissioners voted to reverse the ALJ's decision. The two affirming Commissioners disagreed about the degree of deference owed to the Secretary's interpretation of § 75.333(e)(1)(i). They both found, however, that the Secretary's interpretation was entitled to deference and voted to affirm the ALJ's findings that Peabody Twentymile had not constructed the concrete block stoppings using a "traditionally accepted method" in violation of § 75.333(e)(1)(i).

The reversing Commissioners found that "traditionally accepted method" has a plain meaning and that MSHA had "traditionally accepted" Peabody Twentymile's use of polyurethane foam to seal the perimeter of its block stoppings because it had not issued previous citations for the practice and had consistently approved the mine's ventilation plans. The reversing Commissioners noted,

> [I]t strains credulity to characterize MSHA's continuous approval of Peabody Twentymile's use of polyurethane foam for over 31 years as 'an error' when that approval took the form of explicit approval of its ventilation plans, at least 60 reviews of that plan, and hundreds of inspections covering hundreds of block stoppings without issuing a single citation.

JA at 264. They also concluded that "it defies credulity to assert that MSHA allowed an unsafe practice to exist for three decades in a large and important underground coal

6

mine." *Id.* The reversing Commissioners noted that, even if 30 C.F.R. § 75.333 were ambiguous, the Secretary's interpretation should not be entitled to deference because neither the regulation nor the preamble prohibits the method and the Secretary's enforcement practices prior to 2014 do not align with the Secretary's current interpretation.

As a result of the Commissioners' split decision, the ALJ's decision stood as though affirmed. *See Plateau Mining Corp.*, 519 F.3d at 1191; *Sec'y of Labor, Mine Safety & Health Admin. v. Penn. Elec. Co.*, 12 FMSHRC 1562, 1563–65 (1990), *aff'd on other grounds*, 969 F.2d 1501 (3d Cir. 1992).

## II.

Because there is no majority decision from the Commission, we review the ALJ's factual findings for substantial evidence and legal conclusions de novo. *Plateau Mining Corp.*, 519 F.3d at 1191. Questions of statutory and regulatory interpretation are also reviewed de novo. *Bridger Coal Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 669 F.3d 1183, 1190 (10th Cir. 2012).

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1258 (10th Cir. 2016) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). When interpreting an administrative regulation, "we apply the same rules we use to interpret statutes. We begin by examining the plain language of the text, giving each word its ordinary and customary meaning. If, after engaging in this textual analysis,

7

the meaning of the regulations is clear, our analysis is at an end." *Mitchell v. Comm'r*, 775 F.3d 1243, 1249 (10th Cir. 2015) (citations omitted). If the regulation is unambiguous, we will enforce it in accordance with its plain meaning, giving no deference to a contrary interpretation by the Secretary of Labor. *See id.*

This case turns on the meaning of 30 C.F.R. § 75.333(e)(1)(i), which requires permanent ventilation stoppings to "be constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls." The "method" at issue in this case is the use of polyurethane foam to seal the perimeters of concrete block stoppings. The parties acknowledge that Peabody Twentymile's method for constructing block stoppings has not undergone strength testing,[2] and Peabody Twentymile does not argue that its method complies with any of the five methods for stopping construction listed in the regulation's preamble. As a result, Peabody Twentymile's use of foam must be within the meaning of "traditionally accepted method" as that phrase appears in the regulation itself.

The question in this case, then, is what constitutes a "traditionally accepted method" of construction as that term is used in § 75.333(e)(1)(i). The terms "traditionally" and "accepted" are not defined in the standard. The absence of a

---

[2] Peabody Twentymile asserts that the strength of the concrete block stoppings that are sealed with foam around the perimeter is not in jeopardy because the faces of the stoppings are sealed with mortar. Aplt. Br. at 24.

definition in the standard, however, does not necessarily make the term ambiguous. In these circumstances, we apply the ordinary or dictionary definitions of the terms. *Jones v. Comm'r*, 560 F.3d 1196, 1200–01 (10th Cir. 2009) (applying plain meaning of 26 U.S.C. § 1221(a)(3)(B) to conclude taxpayer's charitable donation of discovery material to museum, which was "prepared or produced" for the taxpayer, could not be used to claim tax deduction).

In or around 1996 when the regulation was promulgated, "traditionally" was defined as: "[i]n a traditional manner; by, in the way of, or according to tradition." Oxford English Dictionary (2d ed. 1989). The plain and ordinary meaning of "tradition" was "[a] long established and generally accepted custom or method of procedure, having almost the force of a law." *Id.* "Tradition" was also defined as "[a] time-honored practice." The American Heritage Dictionary of the English Language (3d ed. 1996). "Accepted" was defined as "[w]idely encountered, used, or recognized," *id.*, and as "[r]eceived as offered; well-received; approved" or "[h]ence, satisfactory, acceptable," Oxford English Dictionary (2d ed. 1989). "Traditionally accepted," therefore, means "approved of in a customary manner or regularly over a period of time." Under this interpretation, a method that was repeatedly accepted by MHSA inspectors over a considerable period of time would satisfy the definition of "traditionally accepted."

The Secretary disagrees with this definition of "traditionally accepted" and argues that a method can only be "traditionally accepted" if it appears on the list of methods in the preamble of the regulations. The problem with the Secretary's interpretation, however, is that it is inconsistent with the plain language of the regulation. The

9

regulation's plain language is broader than the Secretary suggests and points to a definition of "traditionally accepted" as a method approved of over a period of time. There is nothing in the language of the regulation that suggests that a traditionally accepted method is somehow further limited. Indeed, as the Secretary points out, there could be many ways in which a method could become traditionally accepted under the plain language of the regulation. Aple. Br. at 19. For example, a method could be accepted by MHSA inspections over a considerable period of time, through long-recognized industry standards, or by regulations that limit or define such methods. *See id.* The broad language of the regulation would permit all of these methods to qualify as "traditionally accepted."

The Secretary points out, and we acknowledge, that a regulation is "ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (quotation marks omitted). But that is not the case here. The term "traditionally accepted," while broad, is not ambiguous, and we are not required to go searching for conflicting interpretations.

Moreover, while the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself. *See Blue Mountain Energy v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 805 F.3d 1254, 1259–61 (10th Cir. 2015) (stating that an ALJ may use the preamble of a regulation as one tool to evaluate expert witness credibility, but should not treat the preamble as binding law (citing *Peabody Coal Co. v. Dir., Office of Workers' Comp.*

10

*Programs*, 746 F.3d 1119, 1124–25 (9th Cir. 2014) (recognizing that a regulatory preamble is not legally binding because it is not subject to notice and comment, but it may be used to inform an ALJ's understanding of a scientific issue))); *see also Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569–70 (D.C. Cir. 2002) ("The preamble to a rule is not more binding than the preamble to a statute. A preamble no doubt contributes to the general understanding of a statute, but it is not an operative part of the statute." (quotations omitted)); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("[L]anguage in the preamble of a regulation is not controlling over the language of the regulation itself."). Here, the limitations that appear in the preamble do not appear in the language of the regulation, and we refuse to engraft those limitations onto the language. Accordingly, after reviewing the language of this key phrase, we find the meaning of the regulation to be plain and unambiguous. *See Mitchell*, 775 F.3d at 1249.

## III.

Because the term "traditionally accepted" has an ordinary and plain meaning, our inquiry is whether Peabody Twentymile's use of polyurethane foam to seal the perimeters of concrete block stoppings was "traditionally accepted" in a manner consistent with the regulation. Peabody Twentymile argues that its use of foam was traditionally accepted because MSHA generally assented to or approved of Peabody Twentymile's construction method over a considerable period of time.[3] We agree.

---

[3] Because the ALJ concluded that the preamble contained an exhaustive list of traditionally accepted methods that did not include Peabody Twentymile's method, the

11

The record shows longstanding acceptance by MSHA of the method in which Peabody Twentymile constructed its concrete block stoppings. The mining operator used foam to seal hundreds of block stoppings over multiple decades. Prior to receiving the citation in 2014, Peabody Twentymile had employed the same method to seal the perimeter of its block stoppings since at least 1991. Peabody Twentymile's use of polyurethane foam to seal its concrete block stoppings preceded MSHA's 1996 promulgation of the regulation approving the use of "traditionally accepted methods." After 1996, Peabody Twentymile continued to use polyurethane foam to seal the perimeters of its concrete block stoppings for eighteen years on hundreds or even thousands of stoppings.

These ventilation stoppings were subject to MSHA's four quarterly inspections each year between 1996 and 2014, and they were also subject to numerous spot inspections. In fact, the reversing Commissioners examined MSHA's records and found that over 800 inspections had occurred at the Foidel Creek Mine since 1995. JA at 258.[4] The Secretary concedes that MSHA issued no citations to Peabody Twentymile regarding the use of foam on block stoppings at any point prior to the 2014 citation at issue. Aple. Br. at 8.

_____

ALJ did not analyze whether Peabody Twentymile's construction method for block stoppings was "traditionally accepted" according to the plain meaning of that phrase.

[4] The reversing Commissioners specifically cite to: Mine Inspections, U.S. Department of Labor, Mine Data Retrieval System, https://arlweb.msha.gov/drs/drshome.htm and directing user to "search for Foidel Creek's Mine ID, '0503836'; then choose 'Inspections,' enter '1/1/1995' as the Beginning Date, and click 'Get Report.'"

12

Additionally, MSHA reviewed and approved Peabody Twentymile's use of polyurethane foam in Peabody Twentymile's ventilation plans at least once every six months. *See* 30 U.S.C. § 863(o); 30 C.F.R. § 75.370(g). A ventilation plan approved by the MSHA district manager that is "suitable to the conditions and mining system" at the Foidel Creek Mine is a prerequisite for Peabody Twentymile's lawful operation of the mine. *See* 30 C.F.R. § 75.370(a)(1); 30 U.S.C. § 836(o). Peabody Twentymile's 1991, 2000, and 2011 plans provided that "[f]oam application for ventilation devices will be limited to sealing cracks and perimeters of ventilation devices," JA at 193, and that Peabody Twentymile's "[a]pplication of foam for ventilation device installation will be limited to sealing the perimeter and joints of such devices," JA at 205; *see also* JA at 195. The Secretary does not dispute that each of these plans was approved by MSHA.

The Secretary all but concedes that it approved of Peabody Twentymile's polyurethane foam method for many years. The Secretary acknowledges both that it issued no citations for Peabody Twentymile's use of the foam, even after hundreds of inspections, and that it approved foam use on ventilation devices in Peabody Twentymile's ventilation plans. This evidence demonstrates that Peabody Twentymile employed a "traditionally accepted method" for constructing its ventilation stoppings. Because we conclude that the foam method employed at Peabody Twentymile's Foidel Creek Mine was traditionally accepted by MHSA, we reverse the decision of the ALJ.

**IV.**

For the reasons stated above, we GRANT the petition for review, REVERSE the decision of the ALJ, and VACATE the citation.

13

No. 17-9540, *Peabody Twentymile Mining, LLC v. Secretary of Labor*
**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent. I disagree with the majority's conclusion that the phrase "traditionally accepted," as used in 30 C.F.R. § 75.333, unambiguously includes Peabody's use of polyurethane foam to seal the perimeters of block stoppings in the Foidel Creek Mine. Instead, I conclude that the phrase "traditionally accepted" is ambiguous and the Secretary of Labor's interpretation of the phrase is persuasive and entitled to deference. And because the ALJ's finding that Peabody violated § 75.333(e)(1)(i) is supported by substantial evidence, I would affirm the decision of the ALJ upholding MSHA's citation of Peabody.

I

I begin by addressing several important facts that the majority omits from its discussion. The particulars in this case matter, especially as they relate to the difference between the two kinds of ventilation stoppings Peabody uses and the language in Peabody's MSHA-approved ventilation plans. I discuss each below.

In an underground coal mine like the Foidel Creek Mine, it is important to keep intake air (clean air) separate from return air (toxic air). A mine's ventilation system does this by drawing air into the mine (intake air), forcing the intake air past areas where coal is being mined, and then exhausting intake air out of the mine as return air. Ventilation stoppings separate intake entries (tunnels that contain intake air) from return entries (tunnels that contain return air) and belt entries (tunnels with conveyor belts that carry coal out of the mine). Ventilation stoppings thereby prevent return and belt air

from contaminating intake air and exposing miners to toxic or explosive gasses.

The Foidel Creek Mine uses two types of permanent ventilation stoppings: Kennedy stoppings and concrete block stoppings.[1] Kennedy stoppings are constructed out of metal panels and assembled on a metal frame. When constructing Kennedy stoppings, Peabody seals both the seams between the stoppings' metal panels and the stoppings' perimeters with polyurethane foam. Concrete block stoppings are constructed out of concrete blocks stacked directly on top of each other with no mortar in between. Since at least 1991, Peabody has sealed the face of its block stoppings using an airtight sealant material and sealed the perimeters of its block stoppings with polyurethane foam.

Peabody's practice of sealing Kennedy stoppings with polyurethane foam is indisputably permissible, as is Peabody's practice of covering the face of the dry-stacked concrete blocks with a sealant. The only issue in this case is whether Peabody properly used polyurethane foam—rather than mortar or a different type of strength-enhancing sealant—to seal the perimeters of its block stoppings.

Peabody argues—and the majority seems to agree—that its practice of sealing the perimeters of block stoppings with polyurethane foam was included in the ventilation plans Peabody periodically submitted to MSHA for approval. "[E]ach mine operator is . . . required to develop and follow a mine-specific ventilation plan." Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n, 519 F.3d 1176, 1181 (10th Cir.

---

[1] Although the majority refers to the two stopping types as "temporary metal panel stoppings" and "permanent concrete block stoppings," Maj. Op. at 4, the record indicates that Peabody uses both Kennedy and block stoppings as permanent ventilation stoppings.

2

2008). Mine operators submit these plans to the MSHA District Office that has jurisdiction over the mine, and the district manager reviews and approves the operator's ventilation plan. 30 C.F.R. § 75.370(a)(1); see 30 U.S.C. § 863(o). An operator's ventilation plan is reviewed every six months "to assure that it is suitable to current conditions in the mine." 30 C.F.R. § 75.370(g).

The majority asserts that "[t]he Secretary acknowledges . . . that [MSHA] approved foam use on ventilation devices in Peabody Twentymile's ventilation plans." Maj. Op. at 13–14. This wording sidesteps the important issue: whether MSHA approved Peabody's use of polyurethane foam to seal the perimeters of block stoppings. It is irrelevant if MSHA approved Peabody's use of polyurethane foam generally in the Foidel Creek Mine. It is similarly irrelevant if MSHA approved Peabody's use of polyurethane foam to seal the perimeters of Kennedy stoppings. The crucial issue, at least under the majority's analysis, is whether, by approving the ventilation plans, MSHA approved Peabody's use of polyurethane foam to seal the perimeters of block stoppings. In my view, the record does not indicate that it did.

MSHA first approved a ventilation plan for the Foidel Creek Mine in 1983. The 1983 Plan includes diagrams depicting how block and Kennedy stoppings are to be constructed, and specifies different construction methods for the two kinds of stoppings. The diagram detailing the construction of block stoppings states that "mortar mix or [an] approved sealant [is to be applied] to [the] periphery of [the] stopping." JA at 190 (emphasis added and capitalization omitted). The 1983 Plan contains a list of "acceptable sealants for dry-stacked block stoppings." Id. at 188 (capitalization omitted).

3

Polyurethane foam is not on this list. In contrast, the diagram depicting the construction of Kennedy stoppings states only that gaps will be filled "with stopping sealer." Id. at 191 (capitalization omitted). Unlike the diagram for constructing block stoppings, the diagram for constructing Kennedy stoppings does not differentiate between acceptable materials for filling gaps on the front of stoppings and acceptable materials for filling gaps on the perimeters of stoppings.

Given these differences, the 1983 Plan is, at the very least, ambiguous about whether it permits the construction of block stoppings by sealing the perimeters with polyurethane foam. It certainly does not expressly allow that method of construction.

Between 1983 and the 2014 citation, MSHA approved three new ventilations plans for the Foidel Creek Mine—in October 1990,[2] May 2000, and June 2011. The 1990 Plan limits "[f]oam application for ventilation devices . . . to sealing cracks and perimeters of ventilation devices." Id. at 193. The 2000 and 2011 plans both contain the following language governing the application of polyurethane foam: "Application of foam for ventilation devices will be limited to sealing the perimeter and joints of such devices." Id. at 195, 205.

None of these later three plans (1990, 2000, or 2011) distinguish between Kennedy and block stoppings. Instead, they each broadly refer to "ventilation devices." And none of the plans either expressly permit or expressly prohibit the use of polyurethane foam to seal the perimeters of block stoppings. Rather, the plans address

_____

[2] The 1990 Plan includes an addendum dated August 7, 1991, which sets forth the 1990 Plan's limitations on foam use.

4

only the general manner in which polyurethane foam will be used—foam use "will be limited to sealing the perimeters and joints of ventilation devices." Id. at 195, 205; accord id. at 193 (1990 Plan, limiting foam application to "sealing cracks and perimeters of ventilation devices").

Therefore, in my view, the 1990, 2000, and 2011 ventilation plans, like the 1983 Plan, are ambiguous about whether they permit the use of polyurethane foam to seal the perimeters of block stoppings. And despite Peabody's and the majority's assertions otherwise, MSHA did not expressly authorize this construction method by approving Peabody's 1983, 1990, 2000, and 2011 ventilation plans.

With this factual background in mind, I turn to the question in this case: whether the phrase "traditionally accepted," as used in § 75.333, includes the use of polyurethane foam to seal the perimeters of block stoppings.

## II

As the majority recognizes, we begin our statutory interpretation analysis by looking to the regulation's plain text. We must first determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341. The precise ambiguity issue in this case is whether the phrase "traditionally accepted," as used in § 75.333, is ambiguous as to whether it includes the use of polyurethane foam to seal the perimeters of block stoppings. I conclude that the

5

phrase is ambiguous.

The relevant portion of the regulation states:

> [A]ll overcasts, undercasts, shaft partitions, permanent stoppings, and regulators, installed after June 10, 1996, <u>shall be constructed in a traditionally accepted method</u> and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls.

30 C.F.R. § 75.333(e)(1)(i) (emphasis added).

The majority omits important statutory analysis steps to conclude based on dictionary definitions—and dictionary definitions only—that the phrase "traditionally accepted" is unambiguous. Crucially, the majority disregards the settled principle "that a dictionary definition, <u>standing alone</u>, is not necessarily dispositive." <u>Hackwell v. United States</u>, 491 F.3d 1229, 1235 (10th Cir. 2007).

> The definition of words in isolation . . . is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.

<u>Dolan v. U.S. Postal Serv.</u>, 546 U.S. 481, 486 (2006); <u>cf.</u> <u>Hackwell</u> at 1233–35 (discussing the dictionary definition of the terms at issue, surveying case law interpreting those terms, and "look[ing] at a statute's relationship to other statutes to determine Congress's intent" (quotations omitted)). The majority ignores this rule, instead relying solely on dictionary definitions of "traditionally" and "accepted" to conclude that the phrase is unambiguous. This is error.

The Supreme Court has frequently concluded that a word or phrase was

6

ambiguous despite the existence of a dictionary definition for the term or terms at issue. In Robinson v. Shell Oil Co., for example, the Court held that the word "employees" in the context of § 704(a) of Title VII was ambiguous as to whether it included former employees. 519 U.S. at 341–45. Of course, the word "employees," on its own, has a dictionary definition. Cf. id. at 341 ("At first blush, the term 'employees' in § 704(a) would seem to refer to those having an existing employment relationship with the employer in question."). But, despite that fact, the Court found the statute ambiguous. Id. at 345.

Similarly, in Yates v. United States, a plurality of the Court concluded that the phrase "tangible object" in § 1519 of the Sarbanes-Oxley Act should be "read to cover only objects one can use to record or preserve information, not all objects in the physical world." 135 S. Ct. 1074, 1081 (2015) (plurality opinion). The plurality acknowledged that "[t]he ordinary meaning of an 'object' that is 'tangible,' as stated in dictionary definitions, is 'a discrete thing' that 'possesses physical form.'" Id. (citations and brackets omitted). But "[w]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words." Id. (emphasis added). "Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." Id. at 1082.

Other examples abound. See, e.g., FAA v. Cooper, 566 U.S. 284, 300 (2012) (discussing the "unremarkable point that the term 'actual damages' can include nonpecuniary loss," but concluding that the term "takes on different meanings in different

7

contexts"); Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303, 318 (2006) ("'[L]ocated,' as its appearances in the banking laws reveal, is a chameleon word; its meaning depends on the context in and purpose for which it is used." (citation omitted)); Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 596 (2004) ("[T]he word 'age' standing alone can be readily understood either as pointing to any number of years lived, or as common shorthand for the longer span and concurrent aches that make youth look good."); Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 808, (1986) ("There is no single, precise definition of ['arising under']; rather, the phrase 'arising under' masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." (quotations omitted)); District of Columbia v. Carter, 409 U.S. 418, 420–21 (1973) (acknowledging that the words "State" and "Territory" "generally have different shades of meaning").

Application of the tools of statutory interpretation reveals that the phrase "traditionally accepted," as used in § 75.333, is ambiguous as to whether it includes the use of polyurethane foam to seal the perimeters of block stoppings. Looking—as the majority does—first at the regulation's plain text, the regulation neither defines "traditionally accepted" nor makes clear which methods of construction are "traditionally accepted." And giving those terms their "ordinary and customary meaning," Mitchell v. Comm'r, 775 F.3d 1243, 1249 (10th Cir. 2015), does not resolve the matter.

First, it is unclear from the regulation who must "traditionally accept" a construction method. Must MSHA as a whole, a specific MSHA District Office, or a particular mine inspector accept the method? It is also unclear at what level the method

8

must be accepted.  Must the method be accepted nationally by MSHA at every coal mine, or only locally at a particular coal mine?  The regulation does not provide an answer, which could be many, any one, or none, of these possibilities.[3]  Cf. Dolan, 546 U.S. at 486 ("A word in a statute may or may not extend to the outer limits of its definitional possibilities.").

Further, the regulation leaves unclear the standards by which "traditional[] accept[ance]" is measured.  Must the particular construction method have been traditionally accepted in 1996 when the regulation issued?  Or could a construction method become traditionally accepted over time?  And how long does it take for a construction method to become traditionally accepted?[4]

Moreover, all of these questions remain unresolved by the majority's definition.

---

[3] The answer to these questions is especially important in this case because Peabody's argument that its construction method was "traditionally accepted" rests largely on MSHA's long history of not citing Peabody for violating § 75.333.  That is, Peabody asserts that, because of MSHA's numerous inspections of the Foidel Creek Mine over the years and approval of Peabody's ventilation plans, MSHA must have known that Peabody was utilizing this construction method.  And, according to Peabody, MSHA's failure to cite it before 2014 indicates that MSHA has "traditionally accepted" its construction method.  That circumstance is more consistent with a manner of acceptance that occurs at either the MSHA District Office level or by particular mine inspectors than with general acceptance by MSHA at the national level.

[4] Even in light of the majority's conclusion that Peabody's method of construction was traditionally accepted, it is still unclear how the majority would answer these questions.  As the majority acknowledges, the record indicates that Peabody has used the construction method at issue since at least 1991—five years before the regulation issued.  But the record also indicates that Peabody continued to use that construction method for at least eighteen years after the regulation issued.  The majority does not elucidate at what point during Peabody's use of polyurethane foam to seal the perimeters of block stoppings that use became "traditionally accepted."

9

According to the majority, "traditionally accepted," as used in § 75.333, unambiguously means "approved of in a customary manner or regularly over a period of time." Maj. Op. at 9. But this definition does not answer who must "approve[] of" a construction method "in a customary manner or regularly over a period of time," when the construction method must be "approved of in a customary manner," or what "period of time" is enough for a construction method to become "approved of in a customary manner."[5]

Finally, looking to "the purpose and context of the [regulation]" and "any precedents or authorities that inform the analysis," Dolan, 547 U.S. at 486, does not resolve the ambiguity in the regulation's language. First, viewing the phrase "traditionally accepted" through the lens of the Mine Act's purpose of promoting mine safety, see Andalex Res., Inc. v. Mine Safety & Health Admin., 792 F.3d 1252, 1253 (10th Cir. 2015), does not elucidate whether that phrase includes the use of polyurethane foam to seal the perimeters of block stoppings. For one thing, even through that lens, it remains unclear by whom, to what extent, and at what period in time a method of construction must be "traditionally accepted." For another, the parties disagree about whether a block stopping more effectively protects miners from toxic air if it is sealed

_____

[5] The majority asserts that it is "not required to go searching for conflicting interpretations." Maj. Op. at 10. However, principles of statutory interpretation do require the majority to acknowledge the existence of readily apparent reasonable interpretations. The majority cannot merely assert that no ambiguity exists, then ignore all other reasonable interpretations. See, e.g., Robinson, 519 U.S. at 341–45 (noting that, "[a]t first blush, the term 'employees' in § 704(a) would seem to refer to those having an existing employment relationship with the employer," but acknowledging and discussing ways in which the statutory context also supports other definitions before concluding that the word is ambiguous).

10

with mortar or sealed with polyurethane foam.  Thus, considering the purpose and context of the regulation does not resolve whether the phrase "traditionally accepted" in § 75.333 includes the use of polyurethane foam to seal the perimeters of block stoppings.

Similarly, looking to other "precedents or authorities that inform the analysis" does not render "traditionally accepted," in the context of § 75.333, unambiguous. Dolan, 547 U.S. at 486.  The preamble provides some insight, but it does not unambiguously define which methods of stopping construction are "traditionally accepted."  See infra pp. 15–17.  And the parties identify no other source of authority to which we could look to determine the meaning of "traditionally accepted."  Accordingly, the phrase is ambiguous.

In sum, the majority's analysis fails in at least two ways.  First, contrary to established rules of statutory interpretation, the majority relies only on the existence of dictionary definitions to conclude that the regulation is unambiguous.  Cf. Dolan, 547 U.S. at 486 ("The definition of words in isolation, however, is not necessarily controlling in statutory construction.").  Second, considering "traditionally accepted" in light of the "purpose and context" of § 75.333 and relevant "precedents or authorities" does not resolve whether it includes the use of polyurethane foam to seal the perimeters of block stoppings.  Id.  Accordingly, because the regulation is "capable of being understood by reasonably well-informed persons in two or more different senses," it is ambiguous. Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1161 (10th Cir 2011) (quotations omitted); see also McGraw v. Barnhart, 450 F.3d 493, 499 (10th Cir. 2006) (concluding a statute is ambiguous when it can be read either narrowly or broadly).  The majority erred

11

in concluding otherwise.

III

Because the phrase "traditionally accepted" in § 75.333 is ambiguous as to whether it includes the use of polyurethane foam to seal the perimeters of block stoppings, I next analyze the level of deference we owe the Secretary's interpretation of the regulation.

Under Auer v. Robbins, 519 U.S. 452 (1997), we fully "defer to the [Secretary's] reasonable interpretation[] . . . unless plainly erroneous or inconsistent with the regulation or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." Mitchell, 775 F.3d at 1249 (quotations and alteration omitted). If Auer deference is not appropriate, the Secretary's interpretation may still be entitled to partial deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944). "Under Skidmore, the degree of deference given informal agency interpretations will 'vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.'" S. Utah Wilderness All. v. Bureau of Land Mgmt., 425 F.3d 735, 759 (10th Cir. 2005) (quoting United States v. Mead Corp., 533 U.S. 218, 228 (2001)).

Here, the Secretary's interpretation is inconsistent with decades of enforcement history at the Foidel Creek Mine, and thus not entitled to deference under Auer. But the Secretary's interpretation is consistent with the language of the regulation, the language of the preamble, and the purpose of the Mine Act, so it is entitled to deference under

12

Skidmore.

A

Peabody argues that <u>Auer</u> deference is inappropriate because decades passed in which MSHA did not cite Peabody for violating § 75.333(e)(1)(i), despite Peabody's open use of polyurethane foam to seal the perimeters of block stoppings. According to Peabody, MSHA's failure to cite it in the past indicates that the Secretary's current interpretation of § 75.333 is inconsistent with past interpretations and therefore not entitled to deference. Peabody is incorrect. MSHA's past failure to enforce § 75.333(e)(1)(i) against Peabody does not necessarily indicate a history of inconsistent interpretation. But it does undermine the appropriateness of <u>Auer</u> deference.

The Supreme Court has instructed that <u>Auer</u> deference may be inappropriate "when the agency's interpretation conflicts with a prior interpretation." <u>Christopher v. SmithKline Beecham Corp.</u>, 567 U.S. 142, 155 (2012). But the Court has also acknowledged that an agency's <u>failure</u> to enforce a regulation does not necessarily reflect the agency's interpretation of that regulation. <u>Id.</u> at 157–58. That is because "an agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred." <u>Id.</u> at 158; accord <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985) (noting that "an agency's decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise"). Therefore, MSHA's mere failure to cite Peabody for using polyurethane foam to seal the perimeters of block stoppings does not support a conclusion that MSHA's current interpretation of § 75.333 conflicts with prior

13

interpretations.

However, when "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." SmithKline, 567 U.S. at 158. In such a situation, "defer[ence] to the agency's interpretation . . . would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires" and "would result in precisely the kind of unfair surprise against which [the Supreme Court has] long warned." Id. at 156 (quotations and brackets omitted).

That is the situation here. MSHA did not cite Peabody for at least twenty-three years, even though Peabody openly used polyurethane foam to seal the perimeters of block stoppings in the Foidel Creek Mine. In this situation, even though MSHA's enforcement history does not necessarily indicate prior inconsistent interpretations, "the potential for unfair surprise is acute," and Auer deference is inappropriate. Id. at 158.

## B

Because the Secretary's interpretation is not entitled to Auer deference, I "accord the [Secretary]'s interpretation a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Id. at 159 (quoting Mead, 533 U.S. at 228). The Secretary's interpretation is consistent with the language of the regulation, the language of the preamble, and the purpose of the Mine

14

Act. All these reasons support deferring to the Secretary's interpretation.[6]

First, the Secretary's interpretation is consistent with the regulation's language. The regulation requires stoppings to "be constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately." 30 C.F.R. § 75.333(e)(1)(i). Thus, although the regulation does not explicitly prohibit the use of polyurethane foam to seal the perimeters of block stoppings, neither does it permit use of the foam in that way. The regulation also states that, even if not constructed in a "traditionally accepted method," stoppings may be constructed "in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls." Id. Polyurethane foam has not been shown to have such a minimum strength, and therefore does not satisfy the regulation's alternative allowance. For these reasons, the Secretary's interpretation is consistent with—although not necessarily dictated by—the regulation's language.

The Secretary's interpretation is also consistent with the regulation's preamble.[7]

_____

[6] As discussed, the Secretary's interpretation of § 75.333(e)(1)(i) is inconsistent with its enforcement history at the Foidel Creek Mine, which admittedly decreases its persuasive value. But this is just one of several factors and, on the whole, MSHA's interpretation is persuasive and entitled to deference under Skidmore.

[7] Peabody argues that "the Secretary [erroneously] relied principally on the language in the preamble to the rule to override the plain language of the rule." Aplt. Br. at 25. Peabody also asserts that the Secretary concludes "the preamble is rule and . . . binding[, but i]t is not." Aplt. Reply at 9–10. These arguments fail.

As discussed, the regulation is ambiguous as to whether it allows the use of polyurethane foam to seal the perimeters of block stoppings, so the Secretary properly looked to the preamble to interpret the regulation's meaning. See, e.g., Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (10th Cir. 1999) ("While language in the preamble of a regulation is not controlling over the language of the regulation

15

The preamble states:

> Since the inception of the Mine Act, a number of traditionally accepted construction methods have performed adequately and have served their intended function of separating air courses. These traditionally accepted construction methods <u>are</u>:
>
> [(1)] 8-inch and 6-inch concrete blocks (both hollow-core and solid) with mortared joints;
> [(2)] 8-inch and 6-inch concrete blocks dry-stacked and coated on both sides with a strength[-]enhancing sealant suitable for dry-stacked stoppings;
> [(3)] 8-inch and 6-inch concrete blocks dry-stacked and coated on the high pressure side with a strength enhancing sealant suitable for dry-stacked stoppings;
> [(4)] steel stoppings (minimum 20-gauge) with seams sealed using manufacturer's recommended tape and with the tape and perimeter of the metal stopping coated with a suitable mine sealant; and
> [(5)] lightweight incombustible cementatious masonry blocks coated on the joints and perimeter with a strength enhancing sealant for dry-stacked stoppings. . . .
>
> For new construction methods or materials <u>other than those used for the traditionally accepted constructions above</u>, the final rule requires that the strength be equal to or greater than the traditionally accepted in-mine controls.

61 Fed. Reg. 9783–84 (emphases added). The Secretary reads the preamble's list of traditionally accepted construction methods as exhaustive. This interpretation is reasonable.

First, the preamble uses the word "are," rather than a broader word such as "include" to introduce the list of traditionally accepted construction methods. This word choice indicates that the list is exhaustive. Second, the preamble also specifies that the strength of construction methods or materials not included in the preamble's list must "be

---

itself, we have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules." (citation omitted)).

16

equal to or greater than the traditionally accepted in-mine controls." Id. This indicates that a construction method not listed in the preamble must prove itself to be equal or superior to those listed, and thus is not "traditionally accepted." The Secretary's interpretation is therefore consistent with the regulation's preamble.

Finally, the Secretary's interpretation of § 75.333(e)(1)(i) advances the Mine Act's purpose of promoting the safety and health of mine workers. Testimony before the ALJ indicated that it is safer to seal the perimeters of block stoppings with mortar than with polyurethane foam because mortar allows less air leakage, degrades at a slower rate, and enhances a stopping's strength. Testimony also indicated that if a fire erupted in a mine, foam would burn away, allowing return air to mix with intake air and exposing miners to toxic fumes. This testimony supports the conclusion that using mortar to seal the perimeters of block stoppings is safer for miners than using only foam. Protecting the safety of miners is at the heart of MSHA's mission. See 30 U.S.C. § 801(a). The Secretary's interpretation therefore also advances the Mine Act's purpose.

In summary, the Secretary's "announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, [so] the potential for unfair surprise is acute," and Auer deference is not appropriate. SmithKline, 567 U.S. at 158. However, the Secretary's interpretation is consistent with the regulation's language and preamble and furthers the purpose of the Mine Act, so that interpretation is entitled to Skidmore deference.

IV

Because I conclude that the Secretary's interpretation is entitled to deference, I

17

analyze whether the ALJ's finding that Peabody violated § 75.333(e)(1)(i) is supported by substantial evidence and therefore conclusive. Plateau, 519 F.3d at 1193–94.

> Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla but less than a preponderance. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.

Id. at 1191 (quoting Zoltanski v. FAA, 372 F.3d 1195, 1200 (10th Cir. 2004)).

To establish a violation of § 75.333(e)(1)(i), the Secretary must prove that Peabody's stoppings were not "constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls." 30 C.F.R. § 75.333(e)(1)(i). The ALJ determined that Peabody's use of polyurethane foam to seal the tops and perimeters of block stoppings violated § 75.333(e)(1)(i) because that construction method was not "traditionally accepted."

Peabody argues that the ALJ's determination that it violated § 75.333(e)(1)(i) has no evidentiary support. However, Peabody concedes that it did not construct its block stoppings using a method listed in the preamble. And, as discussed, the Secretary reasonably interprets the list of "traditionally accepted methods" in the preamble to be exhaustive. Thus, the ALJ's finding that Peabody violated 30 C.F.R. § 75.333(e)(1)(i) is supported by substantial evidence, and I would affirm that decision.

18

V

In my view, the phrase "traditionally accepted," as used in 30 C.F.R. § 75.333 is ambiguous as to whether it includes Peabody's use of polyurethane foam to seal the perimeters of block stoppings. Because the language is ambiguous, I would defer to the Secretary's persuasive interpretation of the regulation to exclude the use of polyurethane foam to seal the perimeters of block stoppings. And because the ALJ's finding that Peabody's violation of § 75.33(e)(1)(i) is supported by substantial evidence, I would affirm the ALJ's decision upholding MSHA's citation.

I respectfully dissent.